UNITED INDUSTRIES, INC.

v.

SIMON–HARTLEY, LTD.

Civ. A. No. 89–411–B.

United States District Court, M.D. Louisiana.

April 5, 1994.

William David Kiesel, Roy, Kiesel, Aaron & Tucker, Baton Rouge, LA, for plaintiff.

James Rodney Chastain, Jr., Christine Lipsey, Gordon A. Pugh, Claude F. Reynaud, Jr., Breazeale, Sachse & Wilson, Baton Rouge, LA, for defendant.

## OPINION

POLOZOLA, District Judge.

This case requires the Court to determine the scope and meaning of a license agreement which exists between United Industries, Inc. ("United") and Simon–Hartley, LTD. ("SHL").[1] United contends that the license agreement gives it the exclusive right to market SHL's Simcar vertical aerator in conjunction with United's own Boat intra-channel clarifier and the non-exclusive right

---

1. The Court has jurisdiction over this controversy pursuant to 28 U.S.C. § 1332(a)(2).

to market the Simcar vertical aerator by itself. On the other hand, SHL contends that the license agreement only gives United the exclusive right to market SHL's Simcar vertical aerator in conjunction with United's Boat intra-channel clarifier. SHL also asserts, by way of counterclaim, that it was the victim of fraud on the part of United and the agreement should be rescinded.

After conducting a lengthy trial in this case, the Court issued a memorandum opinion which provided:

(1) the licensing agreement dated October 8, 1988, shall be rectified to allow plaintiff to market the Simcar vertical aerator in both boat and non-boat applications;

(2) defendant's counterclaim for rescission shall be dismissed.

The Court now sets forth detailed reasons for its decision. In formulating the Court's findings of fact, the Court took into consideration the credibility of the witnesses who testified in this case. The Court must note that the credibility of the witnesses was a major issue in this case and played a major role in the Court's determination of the facts in this case. The Court must also note that the facts of this case were complex and technical. For this reason, some background information is needed to define the terminology, products and companies involved in this case.

## I. Background

United and SHL are both members of the sewage treatment industry. United manufactures and sells equipment for use in oxidation ditches. An oxidation ditch is an elongated ditch with a center partition in which sewage is treated by the addition of oxygen. An aerator is placed within the oxidation ditch in order to add oxygen to the sewage and keep the sewage moving around the ditch at sufficient velocity to prevent the settlement of solid particles within the sewage.

Prior to May 5, 1987, the use of a vertical turbine aerator in an oxidation ditch was subject to a patent. The patent rights were licensed by DHV[2], a corporation from the Netherlands, to Eimco Process Equipment Company ("Eimco") who marketed an aerator under the trade name "Carrousel." Eimco also sold a vertical turbine called the Hubert aerator. The only other comparable aerator used in the United States is the Simcar aerator, to which SHL holds the patent. SHL has licensed the right to market the aerator to its sister corporation in the United States, Ashbrook–Simon–Hartley ("ASH"). Although the license agreement between ASH and SHL bears the date June 1, 1988, this license agreement was not reduced to writing until after the agreement between SHL and United was executed.[3] ASH has not actively marketed the Simcar aerator since the expiration of the patent licensed to Eimco. ASH also markets two aerators from which SHL receives no royalties and which can be used instead of the more expensive Simcar aerator in some applications.

Once the sewage is agitated by an aerator, the second stage of sewage treatment is clarification, a process by which solids are separated from liquids. The Boat clarifier, which is also known as the Scumsucker, is a hydraulic device that sits in the oxidation ditch. The sewage, stirred by the aerator, enters the back of the Boat where the solids settle. The remaining fluid then is sucked out the bottom of the Boat through tubes. Beard Engineering is the corporate parent of both United Industries and Beard International. Harold Beard serves as chairman of the board of United and president of Beard International. United is the holder of the United States patent for the Boat intra-channel clarifier and markets the Boat in the United States. Beard International licenses the Boat outside the United States. In 1986, Beard International granted a license to Simon Hartley.

## II. Findings of Fact

To boost the sales of its Boat clarifier, United initially tried to develop its own vertical turbine aerator, which it called the Spinnaker. In 1987, Beard started to design and

---

**2.** This is short for DHV RAAGEVEND INGENIEURSBUREAU BV.

**3.** Pl.'s Ex. 41.

test models of an aerator. By 1988, Beard had developed two scale models. When it became obvious that Beard no longer had the facilities to test larger versions of its aerator design, it sought to have a ten-foot diameter model tested in a working oxidation ditch in Morgan City. It was also clear that more development was needed before this aerator design could be offered for sale. Harold Beard also believed that United would have to have substantial funds to market his newly developed aerator.

For these reasons, United began to negotiate with ASH for a license to market the Simcar vertical turbine aerator. Beard attempted to negotiate an original equipment agreement or "OEM" with Michael Hartley, who was not a representative of ASH, whereby United could buy or manufacture equipment designed by ASH for sale under the United trade name. However, due to opposition from ASH, an agreement could not be reached.

On May 6, 1988, Beard wrote a letter to Robin Millard, the managing director of SHL, expressing his disappointment that SHL had not sold more Boat clarifiers.[4] Beard suggested that SHL should either buy Beard International and the patent rights to the Boat clarifier outside of the United States or renegotiate the current Boat license agreement to include minimum royalty provisions. Millard responded by fax on May 20, 1988 and recommended that Beard and he meet in England or the United States to discuss the possible acquisition of Beard International by SHL.[5] At this time, neither party had mentioned or discussed the possibility of negotiating a license agreement for the Simcar aerator between United and SHL.[6]

In June of 1988, Beard went to England where he met with Millard over two days. During the meeting on the first night, Beard and Millard held discussions while having drinks. Millard explained to Beard that SHL had just taken on a project using Boat clarifiers which would generate about four million dollars in revenue. The testimony revealed that Beard was impressed with this project.

On the following day, the parties engaged in a discussion which lasted approximately two-hours. During this discussion, Beard and Millard talked about the possible sale of Beard International to SHL. The parties also engaged in a minor discussion about Beard visiting a site where he could explain Boat clarifier applications. The sale discussions were expanded by Millard to include Beard Engineering and United because Millard was uncomfortable with not knowing what would become of the relationship between the three companies once Beard International ceased to be controlled by Beard.

In order to show what his companies were worth to Millard, Beard showed Millard a sales/profit projection graph covering the years 1987 through 2002. The trend reflected in the graph line ran up to $9.57 million. Beard arrived at this figure for 1988 projected sales by making the following calculations. In 1987, United received 145 inquiries for Boat clarifiers. From these 145 inquiries, United had received six purchase orders and one additional order was to be placed. Beard felt that at least twenty-two of the remaining inquiries would develop into purchase orders. Thus, the percentage of inquiries that actually or were likely to develop into purchase orders was twenty percent. The average size of the plants involved in the 145 inquiries was 1.15 MGD.[7] The average number of Boat clarifiers required for these 145 inquiries was 1.5 and the average size of the Boat clarifiers required in those inquiries was .56 MGD. From these figures, Beard determined that the projected sales for 1987 would be $9.57 million. From this point, two future trends were drawn: one with a 20% growth rate in inquiries and another one with a 40% growth rate in inquiries.

On the following day, Beard made a trip to a site about one hundred miles from SHL with Eric Austin, a consultant employed by

---

4. Pl.'s Ex. 3.

5. Pl.'s Ex. 4.

6. Tr. Vol. I at 148.

7. "MGD" is the abbreviation for million gallons per day.

SHL and a retired SHL employee, who reported directly to Millard and Patrick Lavell. This trip took up most of the morning. At the end of the day, Beard and Millard met again. The topic of a license agreement between United and SHL which allowed United to market the Simcar aerator in the United States was discussed. Beard explained to Millard the trouble he was having in selling Boat clarifiers to entities using the Carrousel technology. The Carrousel designers would tell their customers that they could not guarantee the operation of their aerators because they were unsure of the effects caused by the presence of a Boat in the oxidation ditch. Millard noted that this discussion gave him the impression that the license would be limited to sales of the Simcar aerator in conjunction with Boat applications only.

Millard advised Beard that ASH was SHL's licensee for the Simcar aerator in the United States, but that ASH was not aggressively promoting the Simcar as evidenced by the royalties SHL had received. Millard also told Beard that he would have to inquire about ASH's position on granting United a license for the Simcar.

After the meeting in England, the remaining negotiations which were required to agree on an acceptable license agreement took place by fax. On June 30, Beard sent a fax seeking the status on United's ability to get a license to market the Simcar vertical turbine aerator so that United would be able to place one in its display booth at the World Pollution Control Federation Conference to be held in Dallas from October 2–5, 1988.[8] Beard sent another fax to Millard on July 12, 1988 to determine the status of a Simcar license.[9] Beard also informed Millard that time was running short for United to construct a Simcar aerator for display at the conference in Dallas and that if no license was forthcoming, United would be forced to display its own aerator. In addition, Beard inquired about SHL's overall position on purchasing Beard International.

On July 22, 1988, Millard responded to Beard's fax of July 12.[10] Millard stated that he was sure that a working arrangement could be finalized for a Simcar aerator license for oxidation ditch applications if Beard would provide some forecast as to the number of aerators that were likely to be sold each year. In addition, Millard insisted that an agreement on the amount of up-front and ongoing royalties be reached "without delay." Millard made no mention in his fax of purchasing Beard International. Beard responded the same day.[11] Beard explained that the sales forecasts for vertical turbine aerators were contained in confidential sales reports which were already in the possession of Millard. Beard also reminded Millard of the time constraints the delay in confecting the licensing agreement placed on United's ability to come up with a working display for the conference in October. Beard also suggested a format for royalty payments under the licensing agreement. Finally, Beard reurged Millard to decide whether SHL would purchase Beard International.

On July 25, Millard faxed a message to Dick Johnson of ASH.[12] Millard advised Johnson of his plans to secure additional royalty income for SHL through an exclusive license agreement with United which would allow United to sell the Simcar aerator only in conjunction with United's Boat, since ASH's sales of the Simcar were only nominal. In this fax, Millard assured Johnson that ASH would retain an exclusive license which would enable it to market the Simcar aerator in other applications. On the following day, Johnson faxed his consent to Millard's proposal to grant United the exclusive license on the condition that the license agreement only allow United to market the Simcar aerator in conjunction with United's Boat.[13] On July 28, Millard faxed Beard.[14] Despite what he

8.  Pl.'s Ex. 5.

9.  Pl.'s Ex. 6.

10.  Pl.'s Ex. 7.

11.  Pl.'s Ex. 8.

12.  Def.'s Ex. 16.

13.  Def.'s Ex. 17.

14.  Pl.'s Ex. 9.

told Johnson in his fax three days earlier, Millard stated:

> I have cleared for you to have an exclusive license for Simcar Aerators with A–S–H, as long as this is restricted to applications for your oxidation ditch and boat clarifier technology. I trust this is what you were looking for, however, having again perused through your sales and earnings projections, you are commenting upon marketing vertical turbine aerators generally, in which case, it may be necessary for you to have a non-exclusive license for other than oxidation ditch and boat clarifier applications. Perhaps you will comment.

The fax also provided that SHL would provide the information necessary for United to construct a display for the conference in Dallas and that SHL was still interested in acquiring Beard International. On the same day, Beard responded by fax that he would prefer an exclusive Simcar license for Boat applications and a non-exclusive Simcar license for other applications.[15] Beard also stated that United would not enter into any agreement providing for a license issued through ASH rather than directly from SHL. In addition, Beard's fax set forth the approximate size of the Simcar aerator United was planning to build for the conference in Dallas and made reference to the possible sale of Beard International. That same day Millard faxed a response to Beard stating that his prior fax was poorly worded and that he always had planned that the license would be issued through SHL and that ASH merely approved this arrangement.[16] Millard also stated in his fax that he had contacted Austin and asked him to draft a license agreement covering sales of the Simcar aerator in conjunction with the Boat clarifier and to negotiate the royalty amounts and the limits on sales of United's own aerators. At no time

did Millard ever negotiate any of the terms of the license agreement with Beard.

Upon receiving Austin's draft of the agreement in the latter part of August, Millard made two corrections.[17] The "Fields of the Agreement" section of the agreement, as submitted by Austin to Millard, read that the licensee could market the Simcar for treatment of:

> (i) sewage;
>
> (ii) liquid wastes from industrial plants whether or not such waste include sewage;
>
> ~~(iii) water to render it suitable for industrial applications.~~ (deletions set forth in document)
>
> by means of oxidation ditches

Millard edited the draft to make the last clause read:

> by means of oxidation ditches linked with the Boat Clarifier applications.

On August 29, Beard faxed Millard and requested his office to send him a copy of the proposed license agreement.[18] On September 2, Millard faxed Beard a copy of the proposed license agreement.[19] Beard immediately faxed back to Millard to advise him that something had gone wrong with the transmission and to retransmit the Definition section containing the "Fields of Agreement" and the Confidentiality section of the agreement.[20] The retransmitted Fields of Agreement section read as follows:

> (b) "the FIELDS OF AGREEMENT" means the treatment of:
>
> (i) sewage;
>
> (ii) liquid wastes from industrial plants whether or not such wastes include sewage;

**15.** Pl.'s Ex. 10.

**16.** Pl.'s Ex. 11.

**17.** Def.'s Ex. 22(b). The Court notes that Def.'s Ex. 22(a) could not have contemporaneously accompanied the draft containing Millard's and Austin's handwritten corrections because the corrections were made in August and Ex. 22(a) purports to have been sent on September 9, which is the same date Pl.'s Ex. 13 was faxed to Beard.

**18.** Pl.'s Ex. 12.

**19.** Pl.'s Ex. 13. Millard states at Tr. Vol. II at 170–72 that he did not see any of the documents purporting to be faxed by him or to him on September 2, 1988.

**20.** Pl.'s Ex. 14.

(iii) by means of oxidation ditches linked with the Boat Clarifier applications.[21]

On the same day, Beard faxed back to Millard a list of four proposed corrections to the license agreement:[22] (1) Beard wanted the licensee to be United instead of his other corporation, Beard International; (2) to clarify the nature of each right granted by the license, Beard suggested that the Fields of Agreement section should be changed to read:

(b) "the FIELDS OF AGREEMENT" means the treatment of:

(i) sewage; (non exclusive rights)

(ii) liquid wastes (non exclusive rights) from industrial plants whether or not such wastes include sewage;

(iii) by means of oxidation ditches linked with the Boat Clarifier applications (exclusive rights).

(3) Beard sought a change in the structure of the royalty payments schedule; and (4) Beard desired to change a proposed clause which would prohibit United from manufacturing and marketing its own vertical turbine aerator which was in the early stages of development.

On September 14, 1988, Austin faxed a response to Beard's proposed changes which had been originally directed to Millard.[23] Austin's handwritten fax read:

... 1. Your item (1) OK

2. Your item (2) OK ...

Austin countered with a new royalty payment schedule because he believed Beard's figures were too low. Austin also suggested that any aerator developed by United would be considered an improvement and become the property of SHL, would be subject to the new proposed royalty payment schedule, and would be marketed under the Simcar trade name.

This fax prompted a response by Beard on September 15.[24] In this fax, Beard stated that he agreed with the original royalty schedule, but as to United's vertical aerator currently under development, the terms were unacceptable. Beard felt, that because of the substantial amounts of money and time already invested into United's aerator, the United aerator should be exempt from the improvements clause, but aerators developed by United in the future should be subject to the improvements clause.

Austin faxed back to Beard on September 28, 1988, a response.[25] The fax was handwritten and read:

Dear Harold,

Re—Your fax of 15 Sept 88 we are pleased to have your agreement on the licence [sic] and royalty fees.

We have further discussed the inference of Clause 7(1)(c) and feel that this should take into account, quite positively, any new aerator inventions since otherwise our ongoing royalties position would be prejudiced. Accordingly, after consultation with Robin, I have redrafted certain clauses which are attached hereto and to which we hope you will agree.

Please bear in mind also that with the above in place you would be entitled to use the name SIMCAR as prefix your new aerator and that this should be an important bonus to aid overcoming market prejudice. I hope we can complete this exercise to enable Robin to bring over the agreement for signature.

Kind Regards

Eric

Attached to this fax was a new draft of the licensing agreement. All references to Beard International Inc. were deleted and changed to United Industries Inc. The Fields of Agreement section was not changed and read as it did on September 2, 1988. Section 7(1)(c) of the agreement was changed to reflect Austin's proposal of September 14.

Millard arrived in Dallas, Texas a few days before the execution of the agreement in order to attend the World Pollution Control Conference. When he arrived, Millard was

---

21. Pl.'s Ex. 15.

22. Pl.'s Ex. 16.

23. Pl.'s Ex. 18.

24. Pl.'s Ex. 20.

25. Pl.'s Ex. 22.

besieged by representatives of ASH who told Millard that he should change the wording of the license agreement.[26] They complained that half their license was being taken away by the new agreement between SHL and United which allowed United to sell the Simcar aerator in non-Boat applications. Millard reviewed the agreement for the first time since August and modified the Fields of Agreement section at ASH's office in Houston to read:

> (b) "the FIELDS OF AGREEMENT" means the treatment of:
>
> (i) sewage and
>
> (ii) liquid wastes from industrial plants whether or not such wastes include sewage; by means of oxidation ditches linked with the Boat Clarifier applications.[27]

Millard saw Beard at the show but did not tell Beard that he had changed the agreement or that he was considering a change to the agreement.

Millard arrived in Baton Rouge the following Saturday and went to United's office. During their meeting, Beard again brought up the proposition of SHL's buying Beard International. After this discussion, Millard presented Beard two copies of the license agreement for execution. Beard handed one copy of the agreement to Raleigh Cox, the president of United, and Marc Beard, Beard's son, to allow them to check it against the last proposed draft. When they returned, Cox explained to Millard that the signature page needed to be changed to include a line for his signature instead of Beard's and that the front cover should be re-typed so the word "DRAFT" would not be on the agreement. Before the agreement was executed, Cox started to write in the Fields of Agreement section before the words "by means of ..." three *i*'s. Millard objected to the insertion by Cox and told Beard that the fact that the three *i*'s were

omitted did not change the meaning of the agreement. Beard, relying on Millard's word, instructed Cox to sign the agreement.

After signing the agreement, United proceeded to market the Simcar aerators in both Boat and non-Boat applications. In order for United to bid projects and build an aerator for a given project, it was necessary for United to get technical support from SHL. United did not have the computer software needed to determine the size of an aerator or the amount of horsepower the aerator must generate in order for the aerator to function properly in a given application. From October 27, 1988 to March 3, 1989, various faxes were sent between SHL and United concerning technical support for non-Boat applications of the Simcar aerator.

On October 18, 1988, Bob Black, the national sales manager of ASH, telephoned Beard in Baton Rouge. Black asked Beard if it was true that Beard was offering the Simcar aerator in non-Boat applications. Beard advised Black that this was true. Black advised Beard that this was not what was in the agreement between SHL and United that he read. After receiving this call, Beard sent a fax to Millard outlining the conversation with Black of ASH.[28] Black also faxed Millard on the same day.[29] In his fax, Black expressed his concern over Beard's statement that Millard agreed with Beard's interpretation of the license agreement. Black also wanted to know whether Millard had made the wording changes to the agreement that Black had discussed with him in Dallas.

In response to the faxes, Millard sent separate faxes to Beard and Black on October 18. Millard advised Black that a complete copy of the agreement between SHL and United had been given to another ASH representative and that there was no misunderstanding on SHL's part as to the terms of

---

**26.** Pl.'s Ex. 31. The Court finds this exhibit relevant to the proceedings in that it shows the document was changed by Millard and rebuts Millard's statement that he did not believe he changed the wording of the agreement to appease representatives of ASH.

**27.** Pl.'s Ex. 23. Millard testified that he did not think he made the change to appease ASH. Tr. Vol. II at 176.

**28.** Pl.'s Ex. 24.

**29.** Pl.'s Ex. 25.

the agreement.[30] Millard also told Black that he should keep out of the dispute and that he questioned the motives of ASH since it had failed to sell Simcar aerators in the quantity that SHL anticipated. Millard sent the following message to Beard by fax:

Dear Harold,

I received your fax concerning our Simcar Aerator Agreement with some dismay since within 10 minutes I had a similar communication from Ashbrook and I myself and I am sure you can do without the hassle which I am trying to resolve.

The basis of our Agreement is quite clear in that you have the rights to apply Simcar on Boat Clarifier Oxidation Ditch applications for both industrial and Municipal applications whether or not these are applied to sewage treatment.

This whole affair is becoming a broader issue beyond Ashbrook, aerators and Simon–Hartley and we need to cool the situation down to give ourselves time to manoevre [sic].

For instance can you tell me how Eimco know what is in the agreement which we sent to your office less than two weeks ago?

I need some help! [31]

Beard responded to this fax by stating that the agreement gives United the non-exclusive right to sell the Simcar on all sewage projects and the exclusive right to sell the Simcar with the Boat clarifier which was given in exchange for United's agreement to hold off on the design of its own aerator. Beard also stated that Black probably told Eimco about the agreement between SHL and United.[32]

Later that same day, Millard telephoned Beard to ask him for United's projected aerator sales in order that Millard could have them for a meeting with Eimco and DHV in the Netherlands on October 31. Beard faxed Millard a copy of a memorandum that Gary Beard put together after speaking to four of the forty-five sales regions and reiterated that United would be marketing the Simcar aerator in all areas.[33] At the meeting in the Netherlands, DHV and Eimco complained to Millard that the entry of a new licensee which offered the Simcar on Carrousel Pipe Systems was spoiling the market place. At no time did Millard tell DHV or Eimco that United could not sell the Simcar aerator in non-Boat applications and that only ASH had the right to do that.

Millard spoke to Beard two more times without any discussion of the scope of the license. On February 7, 1989, Bob Black sent a fax to Millard asking for a written confirmation that United's license did not extend to non-Boat applications.[34] Millard telephoned Bob Black and told him that he already had a copy of the license agreement which was clearly worded.

In 1989, Eimco sued United in Utah. United responded by filing an anti-trust suit against Eimco, DHV, and ASH in this Court.[35] Millard contacted Beard in early April of 1989 suggesting that SHL take away the license granted to ASH and make United its exclusive licensee in the United States of the Simcar aerator.

In the latter part of April, 1989, the written license agreement between ASH and SHL was finalized. At a meeting held on April 14, 1989, Millard, a representative from ASH, and James Felker—a representative of the corporate parent of ASH and SHL—discussed the anti-trust suit filed by United.[36] During this meeting, it was decided that the written license agreement between ASH and SHL be back-dated to reflect that it was executed on September 30, 1988.[37] Later,

30. Pl.'s Ex. 26.

31. Pl.'s Ex. 27.

32. Pl.'s Ex. 28.

33. Pl.'s Ex. 29.

34. Pl.'s Ex. 32.

35. Eimco's suit was dismissed without prejudice after the court dismissed the anti-trust action filed by United.

36. Pl.'s Ex. 76.

37. Millard testified that the backdating was done for some purpose totally unrelated to the license agreement between United and SHL. Tr. Vol. II at 77.

Felker sent a memorandum to Millard suggesting that the ASH license be backdated as far back as June 30, 1988 so as "not only to normalize the situation with regard to United Industries, but also takes it into consideration proper documentation for tax purposes." [38]

Having summarized the facts of this case, the Court must now set forth the law which must be applied herein.

## III.   Conclusions of Law

The license agreement executed by United and SHL provides that the agreement "shall be interpreted and the rights of the parties determined in accordance with English law." [39]   The parties agree that this provision applies to the instant dispute and have provided the Court with the necessary materials to resolve the matter under English law.  As noted earlier, the Court's assessment of credibility of the witnesses is especially important in this case where the testimony of multiple witnesses is in conflict. [40]

### A.   Rescission Counterclaim

■   SHL asserts, in its counterclaim that Beard misrepresented United's sales for the year 1988 by means of a projected sales graph.   Under English law, an actionable misrepresentation must be material [41] and either be a misrepresentation of fact or a statement of intention made at a time that the person making the statement knows the intention will not be put into effect. [42]   The party relying on the misrepresentation need not prove that the misrepresentation was the sole reason for the party's decision to enter into a contract in order to prevail [43].   There is no requirement of proof of fraudulent intent unless the person making the misrepresentation proves that he had a reasonable

ground to believe the facts misrepresented were true. [44]

■   Applying the above law to the facts of this case, the Court concludes that SHL has failed to prove its entitlement to rescission of the license agreement.   The Court's decision is clearly supported by the following facts.   Beard made no misrepresentation of fact to Millard while negotiating the Simcar license.   Defendant's Exhibit 8 contains the sales projection graph that includes the alleged misrepresentation.   The title on the front cover of the document containing the graph reads in large capital letters "SALES AND EARNINGS PROJECTIONS."   The graph is titled in capital letters "UNITED INDUSTRIES, INC. SALES AND PROFIT PROJECTIONS" and the y-axis bears the label "PROJECTED YEARLY SALES AND PROFIT VOLUME."   Projections are not facts.   They are, as United correctly argues, an estimate or opinion of what will happen in the future.   English law differentiates between opinions expressed in good faith and misrepresentations. [45]

The projections in the graph were not facts, nor were they disguised as facts.   Beard clearly explained to Millard that the projected sales figures were calculated by taking the average number of Boats sold and multiplying it by the average sales price of a single Boat of average size then multiplying this figure by the number of projects for which United either received purchase orders or was likely to receive purchase orders.   Millard described the whole process of explaining the calculations as a "teaching." [46]   If this oral teaching did not make Millard aware of exactly what he was reading, then the explanation entitled "Explanation of Graph 1" immediately following the graph

---

**38.**  Pl.'s Ex. 77.

**39.**  Pl.'s Ex. 23 at ¶ 19.

**40.**  Fed.R.Civ.P. 52(a) states that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses"; *Johnson v. Sawyer*, 4 F.3d 369, 389 (5th Cir. 1993).

**41.**  J.E.B. Fasteners Limited v. Marks, Bloom & Co., 3 All E.R. 289 [1981].

**42.**  Edgington v. Fitzmorris, 29 Ch.D. 459 [1885]; Angus v. Clifford, 2 Ch. 449, 470 [1891].

**43.**  Reynell v. Sprye, Sprye v. Reynell, 1 De G.M. & G. 660 [1852];  Smith v. Kaye, 7 HL Cas. 750, 759 [1959].

**44.**  Section 21 of The Misrepresentation Act of 1967.

**45.**  1 Chitty on Contracts 271 (26th ed.).

**46.**  Tr. Vol. II at 11.

should have. There was no evidence that Beard was attempting to mislead or deceive Millard.

Furthermore, Millard told Beard that he understood what the graph meant. This would not carry much weight if there had been a great disparity between the sophistication of the parties, but that is not the case here. Despite Millard's "performance" on the stand the Court is convinced that Millard is no less sophisticated a businessman than Beard.[47] Millard is the managing director of a corporation with 300 employees. His corporations do business on a world-wide basis. He assumed that position in 1987. By 1989, he had played a major role in the acquisitions of three companies. Therefore, it would be incredible to believe that Millard was tricked into thinking that the projected sales were actual sales for United. No matter how rosy a picture the projected sales graph painted, the very next graph in United's SALES AND EARNINGS PROJECTIONS, Graph 2, shows that the number of inquiries for Boat clarifiers decreased in 1988.

Because the Court found that Beard did not misrepresent any facts to Millard, it is not necessary to discuss the other factors required to grant a rescission.

### B. Rectification

■ United seeks rectification of the license agreement executed by SHL and United on October 8, 1988. United and SHL disagree over whether the scope of the license gives United the right to market the Simcar aerator in non-Boat applications. United argues that: (1) on September 14, 1988, Eric Austin, while acting on the behalf SHL, agreed that the license agreement would grant United the right to market the Simcar aerator in conjunction with both Boat and non-Boat applications; (2) the final agreement document that Millard took to the United States provided such; and (3) Millard modified the language of the agreement without calling it to the attention of United be-

fore the agreement was executed. Based on the facts previously set forth in this opinion and other facts presented at the trial, the Court concludes that United is entitled to rectification of the license agreement which was executed on October 8, 1988.

■ Rectification is the English equivalent of reformation in American law. The general rule in English law is that the equitable remedy of rectification is granted where the common intent of both parties is not reflected in the written form of the agreement. As an exception to this rule, rectification is available if one party to the agreement knows that the written form of the agreement contains a mistake benefitting that party but does nothing to correct the mistake or bring it to the attention of the other party.[48] This knowledge coupled with silence or inaction amounts to what is called at English law a "sharp practice."

■ The elements that must be established by United in order to prevail are that:

(1) one party erroneously believed that the written agreement sought to be rectified recorded the common intention of the parties;

(2) the other party was aware that the agreement did not record the common intention of the parties and that it was due to a mistake by the first party;

(3) the second party failed to bring the mistake to the attention of the first party; and

(4) the mistake is one calculated to benefit the second party or is detrimental to the first party.[49]

The Court finds that United has proven each of the above elements. Therefore, the Court concludes, from the faxes which crisscrossed the Atlantic during the summer of 1988, that it is more probable than not that the common intention of SHL and United was that SHL would grant United a license to market the Simcar aerator in both Boat and non-Boat applications. Plaintiff's Exhib-

---

**47.** Tr. Vol. II at 36. This is another instance where the credibility of the parties was an issue in this case. The Court simply did not believe Millard's attempt to paint himself as a stupid, uninformed and inexperienced businessman.

**48.** Thomas Bates Ltd. v. Wyndham Lingerie Ltd., 1 W.L.R. 505, 520 [1981]; Weeds v. Blaney, 247 EG 211 [1977].

**49.** *Thomas Bates Ltd.*, 1 W.L.R. at 515.

it 10 clearly reveals that Beard's intention was to secure a license from SHL which would allow United to market the Simcar aerator with both Boat and non-Boat applications.

SHL contends that the common intention of the parties was to grant United a license which only granted it the right to market the Simcar aerator in conjunction with Boat applications. SHL contends this intent was accurately recorded in the license agreement. These contentions are without merit. The fax of July 8 [50] and Austin's fax to Beard, dated September 28, 1988, show that Austin and Millard had a similar understanding that negotiations would be finished in advance of execution of the contract and that execution of the agreement was a final formality.[51] Millard's changes to the license agreement which were not communicated to Beard prior to the change, cannot reflect the common intention of the parties.

The Court finds that the language in the license agreement that Millard took to the United States correctly reflected the common intention of the parties. Millard first suggested that the Fields of Agreement section read as follows:

(b) "the FIELDS OF AGREEMENT" means the treatment of:

(i) sewage;

(ii) liquid wastes from industrial plants whether or not such wastes include sewage;

(iii) by means of oxidation ditches linked with the Boat Clarifier applications.[52]

Beard countered this suggestion with two of his own. He wanted the cover sheet of the agreement to be changed to read that the license agreement was between SHL and United not Beard International and the Fields of Agreement section to read as follows:

(b) "the FIELDS OF AGREEMENT" means the treatment of:

(i) sewage; (non exclusive rights)

(ii) liquid wastes (non exclusive rights) from industrial plants whether or not such wastes include sewage;

(iii) by means of oxidation ditches linked with the Boat Clarifier applications (exclusive rights).

These changes were faxed to SHL the same day that Millard sent his draft. It is clear from the change suggested by Beard that he believed that United would be allowed to market the Simcar aerator in three separate and distinct fields, only one in which the Boat clarifier was utilized in conjunction with Simcar aerator.

The next communication in the series made by SHL, dated September 14, 1988, came from Austin, the consultant and former employee. Austin wrote and faxed to Beard the following:

... 1. Your item (1) OK

2. Your item (2) OK ...

Austin, at trial, tried to explain that his "OK" did not mean acceptance of Beard's terms.[53] The Court does not believe that a man with Austin's experience would be unaware of the implications and consequences of writing the word "OK" in contract negotiations. Austin was an experienced and competent individual at the time of these negotiations who was retired and working on a part-time basis for SHL as a consultant.

SHL argues that Austin did not have the authority to negotiate the entire agreement but only possessed the authority to negotiate royalty amounts and the limits on sales of United's own aerator. Thus, SHL claims his "OK" is immaterial. Austin testified that he did not have the authority to change the Fields of Agreement section of the license agreement.[54] Millard testified to the same effect.[55] The Court rejects the testimony of both of these witnesses on this issue and finds that Austin had the actual authority to bind SHL with his fax of September 14th and

---

50. Pl.'s Ex. 7.

51. Pl.'s Ex. 22.

52. Pl.'s Ex. 15.

53. Tr. Vol. II at 232.

54. Tr. Vol. II at 230.

55. Tr. Vol. II at 45–46.

to negotiate all the terms of the license agreement.

SHL argues that if Beard's terms were accepted, why was there no visible change made to the Fields of Agreement section in the September 28, 1988 fax to reflect Beard's suggested changes. It is relevant to note that Austin made Beard's first suggested change on which Austin gave his "OK" on September 14th. Furthermore, the structure of the document and Austin's testimony rebut SHL's argument. Exclusivity of the license is controlled by the "Grant" section of the license agreement. This is apparent through a comparison of the United license to the ASH license. The United license provides that "SIMHART grants to the LICENSEE ... the right to exploit the EQUIPMENT in the Fields of this Agreement in the TERRITORY, and ... such licenses under the PATENTS as are necessary to enable such exploitation."[56] The ASH license includes the above clause with the additional language that "SIMHART undertakes that it will not, within the territory, supply for use or exploit the EQUIPMENT, nor assist or permit any party other than the LICENSEE to do so...."[57] The Court's analysis of SHL's method of drafting license agreements is in accord with Austin's testimony.[58]

This raises another problem. How could Austin draft a license that purports to give United the exclusive right to market the Simcar aerator only in non-Boat projects? The answer is that it was not something SHL could grant. United was the only patent holder of the Boat technology in the United States. No Boats were going to be sold without the consent of United. Beard testified that it did not bother him that there was no language suggesting an exclusive license in the agreement because he had exclusive control over the Boat technology.[59] Thus, a non-exclusive license in all fields of agree-ment would accomplish the goal of giving United an exclusive Simcar license with Boat applications. Austin stated in his September 14th fax that he would "redraft" the agreement to accommodate Beard's suggestions, and the Court concludes that he did just that.

Considering evidence other than the drafts of the agreement and the faxes concerning the actual language of the agreement, the Court finds that Millard's and SHL's intention, at least until Millard arrived in Dallas, was to grant United a license to market the Simcar aerator with both Boat and non-Boat applications. The most important and visible evidence of this intention are the Millard and Johnson of ASH faxes of late July, 1988. Millard told Johnson that he wanted to secure "a major opportunity for Simon–Hartley Limited to obtain royalty income from Simcar Aerators, specifically associated with United Industries Oxydation [sic] Ditch/Boat Clarifier systems in the U.S."[60] Johnson stated unequivocally that ASH had "no problem with your proposed license with United Industries provided it complies with the restrictions included in your July 26th fax."[61] In the face of this admonition, Millard, two days after receiving Johnson's fax, faxed Beard to ask Beard if his interest was a license for the Simcar aerator with non-Boat applications as well as Boat applications.[62] At this point in the negotiations, it was clear that both a Boat related and non-Boat related license was contemplated by the parties.

Millard's conduct is consistent with the strained relationship between ASH and SHL. According to Beard's and Millard's testimony, ASH had not pushed the Simcar aerator in the United States markets and had failed to generate as much royalty income as SHL had expected. While it was equally true that ASH sold other products from which SHL received royalties, it was true that ASH sold an aerator which could be used in some

---

56. Pl.'s Ex. 23.

57. Pl.'s Ex. 41.

58. Tr. Vol. II at 254.

59. Tr. Vol. I at 52, 123.

60. Def.'s Ex. 16.

61. Def.'s Ex. 17. Although Johnson refers to Millard's fax being dated the twenty-sixth when in fact it was dated the twenty-fifth, the Court finds that Johnson was referring to Millard's fax dated July 25, 1988 due to the contents of the Johnson's reply fax.

62. Pl.'s Ex. 9.

projects in place of the Simcar and from which SHL received no royalties. Also, Millard personally felt that ASH was using its license agreement to keep SHL out of the United States market.[63] Thus, by SHL granting a license to United to market the Simcar aerator, SHL could expect to get royalties from a segment of the market that was virtually untapped by ASH.

However, what Millard failed to anticipate was the reaction of ASH to the United license. Millard did not foresee that a swarm of ASH representatives would meet him at the Dallas conference complaining about the "fuzzy wording" of the United license.[64] Millard even states in a fax to Black of ASH that "I take it that since you are making such a fuss about United Industries, you do intend to put some effort into this product for the future years."[65] In fact, the wording of the United license agreement was changed at the request of ASH representatives.[66]

After United license agreement was executed, Millard and SHL's conduct was not inconsistent with the intention to grant United the right to market the Simcar with non-Boat applications. At no time did Millard ever clarify to anyone that United's license did not include the right to market the Simcar in non-Boat applications. The October 18, 1993 argument between Black of ASH and Beard would have been an opportune moment to correct any wrong impressions created by the final form of the license agreement. Millard sent one fax to Black and a different fax to Beard. To Black, Millard replied that "there is no misunderstanding on our part and I will resolve this direct with United Industries and would appreciate you keeping out of the situation."[67] To Beard, Millard only told Beard that he had "the rights to apply Simcar on Boat Clarifier Oxidation Ditch applications for both industrial and Municipal applications whether or not these are applied to sewage treatment."[68] He did not tell Beard that he could not sell the Simcar without the Boat clarifier which would have removed any doubts as to the meaning of the license agreement.

Millard also dodged another situation where a simple answer would have dispelled any doubt as to the meaning of the United license agreement. On February 7, 1989, Black of ASH asked for written confirmation that United's license did not extend to non-Boat applications. Millard, by telephone, told him to read the agreement instead of making an unequivocal statement one way or the other.

Finally, Robert Harper, an engineer and employee of SHL, provided technical assistance to United in regard to obvious non-Boat projects.[69] At his deposition given in England on July 5, 1990, Harper testified that he was one of two people who provided Simcar technical assistance. Harper recalled that on one occasion while he was sizing an aerator for a United project that was clearly non-Boat, Patrick Lavell, another employee of SHL, mentioned to him that this project may be beyond the scope of United's license.[70] Harper stated that nothing ever became of the incident and that he continued to supply technical assistance to United whenever United requested it.[71] Millard testified at trial that Harper was instructed not to provide United technical assistance on non-Boat projects after Millard discovered he was doing so.[72] Harper did not remember anyone telling him that certain projects were beyond the scope of the United license, but he knew "someone must have had said something to him because there came a point when he took every inquiry that came from

**63.** Pl.'s Ex. 26.

**64.** Pl.'s Ex. 31.

**65.** Pl.'s Ex. 26.

**66.** Pl.'s Ex. 31.

**67.** Pl.'s Ex. 26.

**68.** Pl.'s Ex. 27.

**69.** Pl.'s Ex. 91 and Def.'s Ex. 57.

**70.** Pl.'s Ex. 91 at 12.

**71.** Pl.'s Ex. 91 at 13.

**72.** Tr. Vol. II at 213–14.

Beards to the director's secretary's office."[73]

From this evidence, the Court concludes that the common intention of SHL and United was that the license agreement would give United the right to market the Simcar in both Boat and non-Boat applications. No evidence of any intention to the contrary was ever directed to United.

The record clearly indicates that Millard and SHL knew that the license agreement did not contain the common intention of the parties and that United did not know this. Millard changed the wording of the license agreement in the offices of ASH either in Houston or Dallas. Millard's testimony does not reveal any communications with Beard after this change regarding the changes made in the agreement.

The evidence adduced at trial also shows that, at the very least, Millard failed to bring to the attention of Beard or any of the United representatives that he had modified the wording of the license agreement. Once again, the Court is required to make a choice between two versions of the same event—the execution of the license agreement in United's office. Cox, the president of United, testified that he noticed that there was an inconsistency between United's final draft and the document brought by Millard to Baton Rouge and questioned Millard about it. Cox testified that Millard told Beard that the modification did not alter the meaning of the agreement. Based on that representation, Beard instructed Cox to sign the agreement. On the other hand, Millard and his wife testified that this conversation did not occur.[74] The Court chooses Cox's version of the events surrounding the execution. Millard not only failed to bring the change to the attention of Beard but also affirmatively misrepresented that his change had no effect on the meaning of the agreement.

Finally, the Court finds that the change caused a detriment to United. This conclusion is so obvious that it needs no further explanation. The Court has considered all of the contentions of the parties and all of the facts presented during the trial whether discussed herein or not.

The Court concludes that United has proven the elements of rectification by a preponderance of the evidence. Therefore, the Court finds the license agreement should be rectified to reflect that United can market the Simcar aerator in conjunction with both Boat and non-Boat applications.

Therefore,

IT IS ORDERED that judgment be and it is entered in favor of the plaintiff which orders that the license agreement between United and SHL be rectified to reflect that United can market the Simcar Aerator in conjunction with both Boat and non-Boat applications.

IT IS FURTHER ORDERED that SHL's counterclaim for rescission be dismissed with prejudice.

Judgment shall be entered accordingly.